## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re

**Jointly Administered under
Case No. 08-45257**

Petters Company, Inc., et al.,

Court File No. 08-45257

Debtors.

Court File Nos.:

(includes:
Petters Group Worldwide, LLC;
PC Funding, LLC;
Thousand Lakes, LLC;
SPF Funding, LLC;
PL Ltd., Inc.;
Edge One LLC;
MGC Finance, Inc.;
PAC Funding, LLC;
Palm Beach Finance Holdings, Inc.)

08-45258 (GFK)
08-45326 (GFK)
08-45327 (GFK)
08-45328 (GFK)
08-45329 (GFK)
08-45330 (GFK)
08-45331 (GFK)
08-45371 (GFK)
08-45392 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

Douglas A. Kelley, in his capacity as the
court-appointed Chapter 11 Trustee of
Debtor Petters Company, Inc.

Plaintiff,

vs.

ADV. NO. _____

Daniel L. Gelb, and
Plaza I, Inc.,

Defendants.

## COMPLAINT

Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Petters

Company, Inc., by and through his legal counsel, Lindquist & Vennum P.L.L.P., as and for his

Complaint against Defendants Daniel L. Gelb, and Plaza I, Inc. (each a "<u>Defendant</u>" and together the "<u>Defendants</u>"), states and alleges as follows:

PARTIES

1.      Petters Company, Inc. ("<u>PCI</u>" or the "<u>Debtor</u>") is a corporation organized under the laws of the State of Minnesota with its principal place of business at 2005 Cargo Road, Minneapolis, MN 55450.

2.      PCI is, and at all times relevant herein was, wholly owned by Thomas Joseph Petters, an individual and citizen of the state of Minnesota ("<u>Petters</u>").

3.      Defendant Daniel L. Gelb is a resident of the State of Minnesota and resides at 9617 Oak Ridge Trail, Minnetonka, MN 55305.

4.      Defendant Plaza I, Inc. is a corporation organized under the laws of the State of Minnesota with its principal place of business at 9617 Oak Ridge Trail, Minnetonka, MN 55305. Upon information and belief, Defendant Daniel L. Gelb is the owner of and is the Chief Executive Officer of Plaza I, Inc.

PROCEDURAL BACKGROUND

5.      On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota (the "<u>District Court</u>") placed PCI into receivership in civil litigation commenced by the United States of America against, among others, Petters and PCI (Court File No. 08-CV-5348) (the "<u>Receivership Action</u>").

6.      By Order of the District Court in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008, the District Court appointed Douglas A. Kelley, Esq. ("<u>Kelley</u>") as equity receiver (the "<u>Receiver</u>") of any affiliates,

2

subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including PCI.

7.      As the court-appointed Receiver, Kelley serves as an agent of the District Court and in that capacity had exclusive custody, control and possession of the property, assets and estates of PCI.

8.      On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed a petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in Court File No. 08-45257.

9.      On October 22, 2008 this Court ordered the above-captioned Bankruptcy cases to be administratively consolidated as *In re Petters Company, Inc., et al.*, under case number 08-45257.

10.     On February 26, 2009, this Court approved the Office of the United States Trustee for the District of Minnesota's appointment of Kelley (the "Trustee"), as the Chapter 11 Trustee for all Chapter 11 debtors in this jointly administered matter, which specifically included appointing Kelley as the Chapter 11 Trustee of PCI.

## JURISDICTION, VENUE AND STANDING

11.     This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

12.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H) and (O).

13.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3

14.     The Trustee has standing to assert the claims herein pursuant to Sections 323, 544, 550 and 1106 of the Bankruptcy Code.

<u>NATURE OF PROCEEDING</u>

15.     The Trustee brings this adversary proceeding against the Defendants pursuant to sections 105(a), 502, 506, 542, 544, 550(a), 551 and 1106 of the Bankruptcy Code, the Minnesota Fraudulent Transfer Act, Minn. Stat. §§ 513.41-51, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states and other applicable law, to recover fraudulent transfers, damages and disgorgement, prevent unjust enrichment and to impose a constructive trust, in connection with transfers of property by PCI to Defendants.

16.     Defendants are initial transferees of the fraudulent or other avoidable transfers alleged in this Complaint, or persons for whose benefit such transfers were made, or  immediate or mediate transferees of any initial transferee of such transfers.

<u>FACTUAL BACKGROUND</u>

**THE PETTERS PONZI SCHEME**

17.     This adversary proceeding arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters, and business organizations that he directly or indirectly owned and controlled.

18.     Petters operated the Ponzi scheme with the assistance of other individuals within certain Petters organizations from approximately 1993 through on or about the date of his arrest by federal agents on October 3, 2008.  Petters, through various entities that he controlled, including PCI, laundered what is estimated to be an amount in excess of $40 billion.

4

19.    On December 1, 2008, Petters was indicted by a Federal Grand Jury in the District of Minnesota. The Indictment charged Petters and PCI with mail and wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering, and charged Petters alone with money laundering, all in connection with the perpetration of and resulting from Petters' and PCI's participation in the Ponzi scheme. On June 3, 2009, a Superseding Indictment was filed charging Petters and PCI with wire and mail fraud, conspiracy to commit mail and wire fraud and money laundering conspiracy and charging Petters alone with money laundering, all in connection with Petters' and PCI's participation in the Ponzi scheme. On December 2, 2009, a jury in the United States District Court of the District of Minnesota found Petters guilty of all 20 counts charged in the Superseding Indictment. On April 8, 2010, Judge Richard H. Kyle sentenced Petters to 50 years in prison for his crimes. PCI has yet to appear in the district court on either the Indictment or the Superseding Indictment.

20.    At various times during the course of the Ponzi scheme, Petters was assisted in the operation of the scheme by numerous individuals and conspirators, including Deanna Coleman ("Coleman"), Robert White ("White"), Larry Reynolds ("Reynolds"), Michael Catain ("Catain") and James Wehmhoff ("Wehmhoff") (collectively referred to herein as "Associates"). Coleman has pleaded guilty to a single count of conspiracy to commit mail fraud. On September 2, 2010, Judge Richard H. Kyle sentenced Coleman to one year and a day in prison for her involvement in the fraud. White has pleaded guilty to a single count of mail fraud. Reynolds and Catain have each pleaded guilty to a single count of conspiracy to commit money laundering. Wehmhoff has pleaded guilty to conspiracy to defraud the United States, conspiracy to commit tax evasion and one count of aiding and assisting in the filing of a false tax return.

DOCS-#3333604-v1

21.     The scheme orchestrated by Petters and his Associates was a common species of fraud known as a Ponzi scheme.  Petters, through a multitude of entities and with the assistance of his Associates, would induce investors into financing the purchase of non-existent electronic equipment purportedly secured by fabricated purchase orders or otherwise provide financing for fabricated purposes.  Petters would then take the funds invested by later investors and repay initial investors not with the earnings or proceeds from the fabricated business purposes for which the financing was purportedly obtained, but with funds obtained from other investors.  The payments were comprised of repayment of the principal amount invested (the "Principal") and often an amount which exceeded the amount invested (the "False Profits").

22.     Petters, through PCI and a multitude of shell companies through which PCI operated, intended that the payments to early investors would induce ongoing, repeated, greater and more widespread investment in the Ponzi scheme and thereby further perpetrate and extend the life of the fraud.

23.     On numerous occasions, investors entered into a number of Promissory Notes (the "Notes") with PCI.  Under the terms and conditions of the Notes, Defendants made funds available to PCI for various falsely represented business purposes including the financing of inventory and the account receivables which would result from the sale of purported electronic goods.  Under the Notes PCI would pay investors an amount equal to both Principal and False Profits.

24.     The Notes were often secured by a Security Agreement entered into by PCI and investor.  The Security Agreement would typically provide the investor with a security interest in the property described as:

> Merchandise as reflected or referred to in the Purchase Order
> attached hereto as Exhibit A or as reflected or referred to in any

6

future documentation, including bills of lading which relate back to Exhibit A;

Any other merchandise which [PCI] has or will acquire rights in or use of to the extent funds advanced by the Secured Party has enabled [PCI] to acquire an interest in such merchandise; and,

Any and all proceeds which [PCI] has or will acquire through the disposal of such merchandise.

25.    Petters and his Associates told investors that funds paid to PCI were to be used to purchase products, when in reality the funds were being funneled to PCI or other entities formed by Petters in order to pay early investors with funds received from later investors.

26.    To obtain investors in the Ponzi scheme, Petters portrayed PCI as a middleman that purchased consumer electronic goods or other goods from wholesalers and resold the merchandise to large, "big box" retailers such as Costco, Sam's Club and B.J.'s Wholesale Club. PCI, through Petters and his Associates, intentionally fabricated the documents to recruit investors into the Ponzi scheme.  Petters and his Associates prepared and utilized fabricated documents that were represented to investors to be equipment purchase orders and related documents.  The fabricated documents included, but are not limited to, (1) purchase orders from PCI to suppliers purportedly ordering electronic goods, and (2) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PCI.  The purchase orders and the related documents were entirely fictitious.

27.    The fictitious merchandise was evidenced by fabricated equipment purchase orders in which the investors would purportedly acquire a security interest.

28.    The high rates of return that were promised to investors promoted two essential goals of the Ponzi scheme: (1) to entice investors, such as Defendants, to invest without employing reasonable due diligence in Petters and PCI; and (2) to extend the life of the fraud and to enable Petters and PCI to pay other earlier investors in the fraudulent scheme.

29.    PCI would show a "profit" on each transaction because PCI's fabricated purchase order from the big box retailer for the merchandise was always for an amount greater than the amount of PCI's fabricated purchase order to its supplier for the same nonexistent merchandise. Petters and his Associates, through PCI, created fictitious profits at will on each and every transaction by simply writing in the appropriate quantity and price information on the two sets of purchase orders to "produce" the necessary funds.

30.    Because the transactions described in the fictitious purchase orders in fact did not exist, the only way PCI was able to transfer sufficient funds to investors including Defendants was by money obtained from other investors, in other words, through the operation, control and management of the Ponzi scheme by Petters and his Associates.  Repayment of the Principal and interest in the form of False Profits to these investors comprised a Ponzi scheme because they were primarily, if not exclusively, from funds invested by other PCI investors.

31.    Petters, or Petters and his Associates, completely controlled and exercised adverse domination over PCI, PGW and other debtor entities at all times relevant herein and until the Receiver was appointed and placed in control of these entities.

32.    Petters, as the owner, officer, and director of PCI, PGW and other debtor entities, was a fiduciary of these entities and had a duty to disclose the fraudulent activities alleged in this Complaint.  Petters, in violation of his fiduciary duty, did not disclose the fraudulent activities to current or prospective investors and other creditors of PCI, PGW, and other debtor entities.

33.    Petters, or Petters and his Associates, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, PGW, and other debtor entities from discovering the fraud.

8

34.     The concealment of the fraud, whether by Petters' silence, the fraudulent and intentional concealment of the facts constituting the fraud, and/or the adverse domination of PCI, PGW, and other debtor entities by Petters or Petters and his Associates, prevented the discovery of the on-going fraud until the Receiver was appointed and placed in control of the entities and the Receiver/Trustee was able to discover facts constituting the fraud alleged in this Complaint.

35.     The Receiver/Trustee has acted diligently to discover facts constituting the fraud alleged in this Complaint.

36.     Any temporal limitations, statutory or otherwise, on the Trustee's ability to bring the causes of action set forth below are tolled by, among other things, Petters' breach of fiduciary duty in failing to disclose the fraud, the actions of Petters, or Petters and his Associates, in fraudulently and intentionally concealing the fraud, and/or the adverse domination of PCI, PGW, and other debtor entities by Petters, or Petters and his Associates, until the appointment of the Receiver.

### FRAUDULENT TRANSFERS TO DEFENDANTS

37.     Defendants transferred money to PCI and received, in return, one or more of PCI's promissory notes signed by Petters as "President" of PCI.

38.     During the course of the Ponzi scheme, Defendants received distributions from PCI representing a return of the Principal invested by it into the Ponzi scheme and also distributions representing False Profits.

39.     Pursuant to the fraudulent mechanisms set forth above, all of which were designed to funnel funds from Defendants through PCI and back to Defendants at excessive rates of return, Defendants engaged in at least 18 separate note transactions with PCI in a principal sum of at least Five Hundred Fifty Thousand Dollars ($550,000.00). Of these note transactions,

9

(a) Defendant Daniel L. Gelb engaged in at least 3 separate note transactions with PCI in a principal sum of at least Two Hundred Thousand Dollars ($200,000.00); and (b) Defendant Plaza I, Inc. engaged in at least 15 separate note transactions with PCI in a principal sum of at least Three Hundred Fifty Thousand Dollars ($350,000.00).

40.    The "interest rates" that PCI paid to Defendants, utilizing funds received from Petters through PCI, generally ranged from 23.23% to 102.86% on an annualized basis.

41.    Prior to the Petition Date, PCI made payments or other transfers totaling at least Six Hundred Fifty Four Thousand Dollars ($654,000.00) to or for the benefit of Defendants.  Of this sum, (a) Defendant Daniel L. Gelb received at least Two Hundred Forty Two Thousand Dollars ($242,000.00); and (b) Defendant Plaza I, Inc. received at least Four Hundred Twelve Thousand Dollars ($412,000.00).

42.    On information and belief, in each instance, every transaction entered into by Defendants to invest in PCI and the Ponzi scheme, was based upon wholly fraudulent and fabricated financial transactions.

43.    Defendants knew or should have known that they were benefiting from fraudulent activity, or at a minimum, failed to exercise reasonable due diligence with respect to Petters and PCI in connection with the Ponzi scheme.  Defendants ignored numerous indicia of fraud from the general manner in which Petters and PCI operated.  Among other things, Defendants were on actual notice of the following additional indicia of fraud and financial irregularity but failed to make sufficient inquiry:

a.    Petters operated PCI without investor transparency.  Petters generally declined to provide investors with financial statements.  He also barred any communication by investors with retailers who Petters represented would be purchasing the fictitious electronics.

Petters also routinely barred investors from viewing and inspecting the purported electronic goods they were financing.

b.      Petters and PCI did not provide investors with electronic online access to their accounts which, had the investments been legitimate, would have shown important financial information regarding payments by bona fide retailers and shipments of electronics which was and is generally customary in the industry for purchase order financing with large retailers.

c.      PCI promised, and produced, returns that were too good to be true, reflecting a pattern of abnormally consistent and significant profitability that was not credible.

d.      Defendants received far higher purported annual rates of return on their investments with PCI, as compared to commercial market rates during the relevant time period.

e.      Defendants did not conduct a performance audit of PCI or match purchase orders, wire transfer confirmations, or other transactional documents with the purported purchases of electronic equipment Defendants were financing.

44.      Prior to the Petition Date, Six Hundred Fifty Four Thousand Dollars ($654,000.00) was paid to or for the benefit of Defendants by PCI (the "Transfers").  The Transfers consisted of substantial amounts of other investors' money that, instead of financing legitimate transactions, was used to pay prior investors, including Defendants.  The Transfers were made to or for the benefit of Defendants and include, but are not limited to, the Transfers listed on Exhibit A .

45.      Of the Transfers, Defendants received False Profits from PCI in the amount of One Hundred Four Thousand Dollars ($104,000.00). Of this sum, (a) Defendant Daniel L. Gelb received False Profits from PCI in the amount of Forty Two Thousand Dollars ($42,000.00); and

(b) Defendant Plaza I, Inc. received False Profits from PCI in the amount of Sixty Two Thousand Dollars ($62,000.00).

46.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

47.     During the course of this adversary proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to Defendants.  It is the Trustee's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property and to or for the benefit of the Defendants or any other transferee.  The Trustee reserves the right to amend this original Complaint as to include:  (i) further information regarding the Transfers, (ii) additional Transfers, (iii) modifications or revisions to Defendants' names, (iv) additional defendants, or (v) additional causes of action (i.e., but not exclusively, 11 U.S.C. §542, §544, §545, §547, §548 and §549) (collectively, the "Amendments"), that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## COUNT I – TURNOVER AND ACCOUNTING

### [11 U.S.C. § 542]

48.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

49.     The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code.

50.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from Defendants of any and all Transfers made by PCI, directly or indirectly, to Defendants.

51.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by Defendants from PCI, directly or indirectly.

### COUNT II – FRAUDULENT TRANSFERS

**[Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws]**

52.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

53.     At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

54.     The Transfers represent transfers that were made or obligations that were incurred with actual intent to hinder, delay or defraud a creditor to which the Debtor was or became indebted on or after the date of the Transfers.

55.     The Transfers were made to or for the benefit of Defendants in furtherance of a fraudulent investment scheme.

56.     To the extent that Defendants are not initial transferees of the Transfers, they are subsequent transferees of the initial transferees of the Transfers, and upon information and belief cannot satisfy their burden that they took the Transfers for value and in good faith, or are entities or individuals for whose benefit such Transfers were made.

57.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and

if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

**COUNT III – FRAUDULENT TRANSFERS**

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws]**

58.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

59.    At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtor that was and is allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

60.    At all times material hereto, the Debtor was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtor after the Transfers were effectuated constituted unreasonably small capital.

61.    The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

62.    To the extent that Defendants are not initial transferees of the Transfers, they are subsequent transferees of the initial transferees of the Transfers, and upon information and belief

14

cannot satisfy their burden that they took the Transfers for value and in good faith, or are entities or individuals for whose benefit such Transfers were made.

63.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

## COUNT IV – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws]**

64.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

65.     At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

66.     At all times material hereto, the Debtor, at the time of the Transfers, intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

15

67.     The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

68.     To the extent that Defendants are not initial transferees of the Transfers, they are subsequent transferees of the initial transferees of the Transfers, and upon information and belief cannot satisfy their burden that they took the Transfers for value and in good faith, or are entities or individuals for whose benefit such Transfers were made.

69.     As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

## COUNT V – FRAUDULENT TRANSFERS

**[Constructive Fraud - 11 U.S.C. §§ 544(b), 550(a), 551 and 1106 & Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws]**

70.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

71.     At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e).

16

The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the Bankruptcy Cases.

72.    At all times material hereto, the Debtor, at the time of the Transfers, was insolvent or, in the alternative, the Debtor became insolvent as a result of the Transfers.

73.    The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

74.    To the extent that Defendants are not initial transferees of the Transfers, they are subsequent transferees of the initial transferees of the Transfers, and upon information and belief cannot satisfy their burden that they took the Transfers for value and in good faith, or are entities or individuals for whose benefit such Transfers were made.

75.    As a result of the foregoing, the Trustee is entitled to judgment pursuant to Bankruptcy Code §§ 544(b), 550(a), 551 and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

## COUNT VI – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

76.    The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

77.     At all times relevant hereto, all funds received by Defendants were part and parcel of the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI from other investors or participants in the Ponzi scheme.

78.     Defendants, as the recipients of fraudulently obtained proceeds of the Ponzi scheme, including the Principal and the False Profits, have no rightful or legitimate claim to any monies received from PCI.

79.     Defendants knowingly received monies from the Ponzi scheme, were unjustly enriched through their receipt of the fraudulently obtained monies to the detriment of other investors in PCI, and in equity and good conscience must be required to repay the proceeds received.

80.     Defendants would be unjustly enriched to the extent they are allowed to retain the monies and proceeds received during their participation in the Ponzi scheme.

81.     Defendants must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Trustee to distribute in equity any such ill-gotten gains among all innocent investors and creditors of PCI.

## COUNT VII – DISALLOWANCE

### [11 U.S.C. § 502(b) and (d)]

82.     The Trustee realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

83.     To the extent that Defendants assert they are entitled to any claim in these Bankruptcy Cases, directly on their own account or indirectly by virtue of any other agreement with Petters, PCI or any of their affiliates, such claim is unenforceable against the Debtors or the

18

property of the Debtors under any agreement or applicable law and should be disallowed under 11 U.S.C. § 502(b).

84.     Further, any claim of an entity from which property is recoverable under 11 U.S.C. § 550 or held by a transferee of a transfer that is avoided under 11 U.S.C. §§ 544 or 548 shall be disallowed by the Court unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable.

85.     As a result of the foregoing, to the extent that Defendants assert they are entitled to any claim in these Bankruptcy Cases, directly on their own account or indirectly by virtue of any other agreement with Petters, PCI or any of their affiliates, all such claims are and should be in all things disallowed.

**WHEREFORE**, the Trustee respectfully requests this Court enter judgment in favor of Plaintiffs and against Defendants as follows:

A.      On Count I – pursuant to sections 542, 550(a) and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Fraudulent Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by Defendants of the property that was the subject of the Transfers or the value of such property.

B.      On Count II – Fraudulent Transfers (Actual Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of

$654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

C.      On Count III – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

D.      On Count IV – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False

Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

E.      On Count V – Fraudulent Transfers (Constructive Fraud), pursuant to 11 U.S.C. §§ 544(b), 550, 551 and 1106, Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding and preserving the Transfers free and clear from any claimed interest of Defendants, (b) directing that the Transfers be set aside, (c) recovering such Transfers in the amount of $654,000 or the value thereof from Defendants for the benefit of the bankruptcy estates of PCI, (d) alternatively, recovering such False Profits in the amount of $104,000, and (e) recovering prejudgment and post-judgment interest, attorneys' fees and costs from Defendants.

F.      On Count VI – Unjust Enrichment/Equitable Disgorgement: declaring and ordering that the Trustee shall recover the Principal and False Profits and any other monies received by Defendants, directly or indirectly, from the fraud perpetrated through the Ponzi scheme, or the value thereof, for the benefit of the bankruptcy estate of the Debtor; and that Defendants shall be liable to the bankruptcy estate of the Debtor in an amount equal to all monies received and shall be required to disgorge the same for the equitable distribution to all creditors of PCI.

G.      On Count VII – Disallowance, pursuant to 11 U.S.C. § 502(b) and (d):  declaring and ordering that, to the extent that Defendants assert they are entitled to any claim in these Bankruptcy Cases, directly on their own account or

indirectly by virtue of any other agreement with Petters, PCI, PGW or any of their affiliates, all such claims are in all things disallowed;

H.       On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of PCI's estate;

I.        On all Claims for Relief, assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the Ponzi scheme;

J.        Awarding the Trustee all applicable interest (including prejudgment and post-judgment interest), attorneys' fees, costs and disbursements in this action; and

K.       Granting the Trustee such other, further and different relief as the Court deems just, proper and equitable.

DATED: September 23, 2010

**LINDQUIST & VENNUM** **P.L.L.P.**

By:  /e/ Sandra S. Smalley-Fleming
Sandra S. Smalley-Fleming (0296983)
George H. Singer (0262043)
Jeffrey D. Smith (0387035)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

**ATTORNEYS FOR
DOUGLAS A. KELLEY
CHAPTER 11 TRUSTEE OF
PETTERS COMPANY, INC.**

### EXHIBIT A
### Transfers to or for the Benefit of DANIEL L. GELB

| Date | Amount | Subtotal |
|------|--------|----------|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| No Transfers Identified | | |
| **Additional Transfers** | | |
| 6/11/2001 | $212,000.00 | |
| 4/9/2001 | $12,000.00 | |
| 2/15/2001 | $18,000.00 | *$242,000.00* |
| **Transfers** | **$242,000.00** | |

**EXHIBIT A**
**Transfers to or for the Benefit of PLAZA I, INC.**

| Date | Amount | Subtotal |
|---|---|---|
| **90 Day Transfers** | | |
| No Transfers Identified | | |
| **Two Year Transfers** | | |
| No Transfers Identified | | |
| **Additional Transfers** | | |
| 6/12/2001 | $106,000.00 | |
| 4/17/2001 | $6,000.00 | |
| 2/21/2001 | $9,000.00 | |
| 11/9/2000 | $4,000.00 | |
| 9/11/2000 | $4,000.00 | |
| 7/12/2000 | $4,000.00 | |
| 5/16/2000 | $4,000.00 | |
| 3/2/2000 | $4,000.00 | |
| 1/1/2000 | $4,000.00 | |
| 10/31/1999 | $4,000.00 | |
| 9/2/1999 | $153,000.00 | |
| 8/30/1999 | $3,000.00 | |
| 8/1/1999 | $3,000.00 | |
| 7/15/1999 | $2,000.00 | |
| 6/24/1999 | $102,000.00 | *$412,000.00* |
| **Transfers** | **$412,000.00** | |